**ROBERTS & SCHAEFER COMPANY, a corporation, and Mingo Logan Coal Company, a corporation, Plaintiffs,**

v.

**SAN–CON, INC., a corporation, Defendant and Third–Party Plaintiff,**

v.

**GLEN ROARK CONSTRUCTION CO., and Ultrasonic Specialists, Inc., a corporation, Third–Party Defendants.**

Civ. A. No. 3:94–0832.

United States District Court, S.D. West Virginia, Huntington Division.

Sept. 14, 1995.

Daniel A. Ruley, Jr., Ruley & Everett, Parkersburg, WV, Robert J. Franco, Bollinger, Ruberry & Garvey, Chicago, IL, for Roberts & Schaefer Co. and Mingo Logan Coal Co.

Paul K. Vey, Pietragallo, Bosick & Gordon, Pittsburgh, PA, for San–Con, Inc.

John L. MacCorkle, Meyer, Darragh, Buckler, Bebenek & Eck, Charleston, WV, for Glen Roark Const. Co.

George N. Stewart, Zimmer Kunz, Pittsburgh, PA, for Ultrasonic Specialists, Inc.

## MEMORANDUM OPINION AND ORDER

GOODWIN, District Judge.

■ Pending before the Court is the motion of the defendant San Con, Inc. (San Con) to disqualify Daniel A. Ruley, Jr. and the law firm of Steptoe & Johnson as counsel for the plaintiffs Roberts & Schaefer Company (Roberts & Schaefer) and Mingo Logan Coal Company (Mingo Logan). The Court finds that Mr. Ruley's continued representation of the plaintiffs presents a conflict of interest. The Court therefore concludes that absent a waiver of the conflict of interest by San Con, Mr. Ruley and Steptoe & Johnson are disqualified from continuing to represent the plaintiffs.

### I. Background

Roberts & Schaefer hired San Con as a sub-contractor to build a coal storage silo for Mingo Logan. Within a year after San Con completed work on the silo, the silo collapsed. This case addresses liability for that collapse.

After the silo's collapse but before this lawsuit, Mt. Hawley Insurance Company (Mt. Hawley), San Con's insurer, hired the law firm of Steptoe & Johnson to evaluate the dispute. Mt. Hawley forwarded materials relating to San Con's role in the matter to James R. Watson, a partner in Steptoe & Johnson. Mr. Watson's office is in Charleston, West Virginia. Not realizing that Steptoe & Johnson had a conflict of interest because of its ongoing representation of Roberts & Schaefer (not the precise subject of this motion to disqualify),[1] Mr. Watson agreed to review the matter for San Con. Mr. Watson performed the requested review

---

1. Apparently, Steptoe & Johnson conducted a conflict-of-interest determination, pursuant to the requirements of Rule 1.7 cmt. of the West Virginia Rules of Professional Conduct (W.Va.R.Prof.Conduct), but failed to discover the conflict because Steptoe & Johnson previously had listed Roberts & Schaefer under the name of its parent company, Jupiter Industries, Inc.

and then prepared and forwarded an evaluation letter to San Con and its insurer Mt. Hawley.

Thereafter, Roberts & Schaefer contacted Steptoe & Johnson about representing Roberts & Schaefer in its dispute with San Con over liability for collapse of the silo. Only at this point did Steptoe & Johnson discover the original conflict of interest that should have precluded Steptoe & Johnson from representing San Con in the first place.[2] Mr. Watson and Steptoe & Johnson then withdrew from their representation of San Con.[3] Steptoe & Johnson likewise declined to represent Roberts & Schaefer and Mingo Logan because of Mr. Watson's former representation of San Con in this precise matter.

Shortly after Steptoe & Johnson's withdrawal, San Con retained its current counsel Pietragallo, Bosick & Gordon. Roberts & Schaefer hired Daniel A. Ruley, Jr., then a partner in the Parkersburg, West Virginia law firm of Ruley & Everett. Mr. Ruley filed this lawsuit on the plaintiffs' behalf. In May 1995, the law firms of Steptoe & Johnson and Ruley & Everett merged. The merger announcement stated in pertinent part:

> The law firms of Steptoe & Johnson of Clarksburg, Charleston, Morgantown, Martinsburg, Charles Town, Wheeling, West Virginia and Hagerstown, Maryland and Ruley & Everett of Parkersburg, West Virginia are pleased to announce the merger of their practices under the name of Steptoe & Johnson[.]

A list of all the attorneys in the newly merged firm, including the name of Daniel A. Ruley, Jr., accompanied the announcement.

Before the formal merger announcement, Steptoe & Johnson, apparently believing that it otherwise would have to withdraw, wrote to San Con and its insurer Mt. Hawley requesting "a waiver of any conflict of interest in Ruley's continued employment" as counsel for the plaintiffs in this lawsuit. Before receiving a response, Steptoe & Johnson and Ruley & Everett merged. Shortly afterward, San Con declined to waive the conflict and requested that the plaintiffs obtain other counsel. Mr. Ruley and Steptoe & Johnson did not step aside. Instead, in an effort to turn two "wrongs" into a "right," they filed a motion to determine that Mr. Ruley was not disqualified from continuing to represent the plaintiffs.

The Court declined to address the issue of disqualification in this initial motion. The Court concluded that absent a motion to disqualify, Mr. Ruley and Steptoe & Johnson should determine for themselves whether continued representation of the plaintiffs was proper. *See* West Virginia Rules of Professional Conduct (W.Va.R.Prof.Conduct) 1.7 cmt. Since that time, however, San Con has filed a motion to disqualify Mr. Ruley and Steptoe & Johnson from representing the plaintiffs. Thus the issue of disqualification is properly before the Court.

San Con bases its motion to disqualify Mr. Ruley and Steptoe & Johnson on the plain language of W.Va.R.Prof.Conduct 1.9 and 1.10. Mr. Ruley and Steptoe & Johnson argue, however, that their "of counsel" relationship makes W.Va.R.Prof.Conduct 1.10 inapplicable. Alternatively, Mr. Ruley and Steptoe & Johnson argue that the Court should not strictly apply those rules in this case, but instead should permit them to continue to represent the plaintiffs because they have set up a "Chinese wall" around Mr. Watson and the information gained from San Con and its insurer Mt. Hawley. In an affidavit, Robert M. Steptoe, managing partner of Steptoe and Johnson, states that he advised Mr. Watson and Mr. Ruley not to discuss this litigation and instructed Mr. Watson to place his entire file in a safety

---

**2.** W.Va.R.Prof.Conduct 1.7(a) precluded Mr. Watson from continuing to represent San Con absent consent. Rule 1.7(a) provides:

> A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:
> (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

**3.** W.Va.R.Prof.Conduct 1.16(a)(1) mandates withdrawal when continued "representation will result in violation of the rules of professional conduct...."

deposit box and to delete all related documents from Steptoe & Johnson's computers and word processing equipment. Mr. Ruley and Steptoe & Johnson believe that these safeguards should be sufficient to protect any confidential information from San Con, while permitting Mr. Ruley to continue to represent the plaintiffs.

## II. Discussion

Rule 3.01 of this district's Local Rules of General Procedure provides that the [Rules] of Professional Conduct of the American Bar Association (ABA), the Model Federal Rules of Disciplinary Enforcement as adopted by this Court, and the [Rules] of Professional Conduct as adopted by the Supreme Court of Appeals of West Virginia provide the basic ethical considerations and disciplinary rules for the conduct of attorneys practicing in this Court. In reviewing San Con's motion to disqualify Mr. Ruley and Steptoe & Johnson, the Court is guided by the principle that motions to disqualify counsel should be viewed with extreme caution because of their potential as a method of harassment. W.Va.R.Prof.Conduct 1.7 cmt. On the other hand, disqualification is appropriate when representation of a client will result in the violation of the Rules of Professional Conduct or other law. W.Va.R.Prof.Conduct 1.16(a)(1).

The Court is also guided by the opinion of the United States Court of Appeals for the Fourth Circuit in *United States v. Clarkson*, 567 F.2d 270 (4th Cir.1977). In *Clarkson*, the Fourth Circuit stated:

> In determining whether to disqualify counsel for conflict of interest, the trial court is not to weigh the circumstances "with hairsplitting nicety" but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing "the appearance of impropriety," it is to resolve all doubts in favor of disqualification. Neither is the court to consider whether the motives of counsel in seeking to appear despite his conflict are pure or corrupt; in either case the disqualification is plain.

*Id.* at 273 n. 3 (citations omitted). Although the Fourth Circuit enunciated this standard in an opinion that antedates both the ABA's and West Virginia's adoption of the Rules of Professional Conduct and placed this standard in a footnote, other courts, including the West Virginia Supreme Court of Appeals, continue to rely on this standard. *See Rogers v. Pittston Co.*, 800 F.Supp. 350, 353 (W.D.Va.1992), *aff'd*, 996 F.2d 1212 (4th Cir. 1993); *Stitz v. Bethlehem Steel Co.*, 650 F.Supp. 914, 916 (D.Md.1987); *Garlow v. Zakaib*, 186 W.Va. 457, 413 S.E.2d 112, 115–16 (1991).

The Court is aware that the comments to W.Va.R.Prof.Conduct 1.10 and the Model Rules criticize the "appearance of impropriety" standard referred to in *Clarkson* and originally contained in the ABA's *Code of Professional Responsibility*. The Court, however, does not believe that those criticisms are wholly valid. First, the comment to Rule 1.10 criticizes the "appearance of impropriety" standard for including "any new client-lawyer relationship that might make a former client feel anxious. If that meaning were adopted, disqualification would become little more than a question of subjective judgment by the former client." The Court believes that the standard includes an objective component and thus requires a showing that a reasonable former client would be concerned by the conflict. The "appearance of impropriety" standard should not be rejected, as the comment to Rule 1.10 implies, on the ground that it is subjective.

Second, the comment to Rule 1.10 criticizes the "appearance of impropriety" standard for failing to define impropriety. If anything, this criticism simply recognizes a weakness in all ethical regulation: a single set of rules cannot address all ethical dilemmas or violations. Just as "impropriety" cannot be defined with exactitude, neither can terms such as "substantially related matter" and "materially adverse."

### A.

The plaintiffs concede that Mr. Watson, the Steptoe & Johnson attorney who originally reviewed the case for San Con, now is disqualified from representing the plaintiffs in this litigation by W.Va.R.Prof.Conduct 1.9. Rule 1.9 provides in relevant part:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a) represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation. . . .

Mr. Watson has represented San Con in the precise matter that is the subject of this litigation, and the plaintiffs' interests are materially adverse to the interests of San Con. Watson therefore cannot represent the plaintiffs in this litigation regardless of "whether confidences were in fact imparted to [Mr. Watson] by [San Con or Mt. Hawley]" in the prior representation. *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir.1980).

### B.

■ Despite conceding that Mr. Watson cannot represent them in this litigation, the plaintiffs argue that there is no conflict of interest because Mr. Ruley will be of counsel, not a partner, associate, or employee of Steptoe & Johnson. According to Mr. Ruley, "of counsel" status makes him an independent contractor to Steptoe & Johnson and the imputed disqualification rule inapplicable. On the record before the Court, this argument appears to be little more than a post hoc effort to deal with the conflict of interest caused by the merger of Steptoe & Johnson and Ruley & Everett. The merger announcement clearly lists Mr. Ruley as an attorney at Steptoe & Johnson. The comment to Rule 1.10 states: "[I]f [two practitioners] present themselves to the public in a way suggesting that they are a firm or conduct themselves as a firm, they should be regarded as a firm for purposes of the Rules." Once the merger occurred and Steptoe & Johnson and Ruley & Everett held themselves out as one firm with Mr. Ruley as an attorney in that firm, it was too late for the parties to recharacterize their relationship.

■ Furthermore, even if Mr. Ruley characterizes himself as "of counsel" to Steptoe & Johnson, such an arrangement would be insufficient to avoid having Steptoe & Johnson's conflicts imputed to Mr. Ruley. Rule 1.10 applies to lawyers who are "associated" in a firm. *Black's Law Dictionary* defines "association" as "the act of a number of persons in uniting together for some special purpose or business." *Id.* at 111 (5th ed. 1979). Assuming that Mr. Ruley and Steptoe & Johnson intended to create an "of counsel" relationship, such was a combining for a special purpose and thus qualifies as an association within the meaning of Rule 1.10. *See Mustang Enters., Inc. v. Plug–In Storage Sys., Inc.*, 874 F.Supp. 881, 884, *supplemented by* 1995 WL 55226 (N.D.Ill.1995); ABA Comm. on Ethics and Professional Responsibility, Formal Op. 94–388, pt. II (1994); Forest J. Bowman, *"Affiliations" Between Law Firms Can Be Very Important*, Bowman's Ethics & Malpractice Alert, July 1995 (Special Supp.), at 3.

### C.

The plaintiffs also argue that the Court should not impute Mr. Watson's disqualification to Mr. Ruley and Steptoe & Johnson. W.Va.R.Prof.Conduct 1.10, which addresses imputed disqualification of law firms, provides in relevant part:

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

(b) When a lawyer becomes associated with a firm, the firm may not knowingly represent a person in the same or a substantially related matter in which that lawyer, or a firm with which the lawyer was associated, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(b) that is material to the matter.

The plain language of both Rule 1.10(a) and 1.10(b) clearly preclude Mr. Ruley and Steptoe & Johnson from continuing to represent the plaintiffs. The plaintiffs do not dispute that San Con is a former client within the meaning of Rule 1.9. The plaintiffs similarly do not dispute that during his representation of San Con, Mr. Watson acquired confidential information protected by Rules

1.6 and 1.9(b), that the representation was in the same or a substantially related matter, or that San Con's interests are materially adverse to the plaintiffs' interests.

Rather, the plaintiffs argue that the provisions of Rule 1.10 are not as absolute as they first would appear. The plaintiffs cite the comments to Rule 1.10, the language of other provisions in the Rules, and case law, as well as a trend to liberalize the rules of imputed disqualification as support for their proposition. The Court finds none of these arguments persuasive.

### 1.

The comment to W.Va.R.Prof.Conduct 1.10 states in pertinent part:

> When lawyers have been associated in a firm but then end their association ... the problem is more complicated. The fiction that the law firm is the same as a single lawyer is no longer wholly realistic. There are several competing considerations. First, the client previously represented must be reasonably assured that the principle of loyalty to the client is not compromised. Second, the rule of disqualification should not be so broadly cast as to preclude other persons from having reasonable choice of legal counsel. Third, the rule of disqualification should not unreasonably hamper lawyers from forming new associations and taking on new clients after having left a previous association....
>
> A rule based on a functional analysis is more appropriate [than per se rules of disqualification or the "appearance of impropriety" standard] for determining the questions of vicarious disqualification.

The plaintiffs read this language as requiring the Court to conduct a functional analysis of the competing interests involved separate and apart from Rule 1.10 to determine whether screening procedures would be appropriate. The plaintiffs miss the point. Rule 1.10 is "[a] rule based on a functional analysis" and incorporates the competing interests within its language. As far as Rule 1.10(b) is concerned, for example, the balance

of competing interests tips in favor of disqualification when a member of the firm has acquired confidential information from the former client, the representation is in the same or a substantially related matter, and the interests of the former client are materially adverse to those of the new client; otherwise, the balance tips against disqualification.

### 2.

■ The plaintiffs also point to W.Va.R.Prof.Conduct 1.11(b), which permits law firms to set up screening procedures around former government attorneys with confidential government information, as support for their assertion that screening procedures would be appropriate in this case.[4] But Rule 1.11(b) merely illustrates that a functional approach to conflicts of interest may lead to different rules in different contexts. As the Second Circuit explained in *Armstrong v. McAlpin,* 625 F.2d 433, 443 (2d Cir.1980) (en banc), *vacated on other grounds,* 449 U.S. 1106, 101 S.Ct. 911, 66 L.Ed.2d 835 (1981):

> [Disapproval of screening procedures] may hamper the government's efforts to hire qualified attorneys; the latter may fear that government service will transform them into legal "Typhoid Marys," shunned by prospective private employers because hiring them may result in the disqualification of an entire firm in a possibly wide range of cases.

Because of the differences between government-to-private-firm moves and private-firm-to-private-firm moves, the West Virginia Supreme Court of Appeals and the drafters of the Model Rules adopted different rules for these different types of moves. The fact that they chose to do so weakens, rather than strengthens, the plaintiffs' argument.

### 3.

The plaintiffs rely on *INA Underwriters Ins. Co. v. Rubin,* 635 F.Supp. 1 (E.D.Penn. 1983), and *Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co.,* 632 F.Supp. 418

---

**4.** W.Va.R.Prof.Conduct 1.12(c) permits similar screening procedures for law firms that hire for-

mer judges, arbitrators, and law clerks.

(D.Del.1986), as support for their argument that screening is permissible in the private-firm-to-private-firm context. The Court agrees that *Rubin* and *Nemours,* although distinguishable, can be read as support for the plaintiffs' argument. The Court, however, notes that the majority of courts considering this issue have rejected the approach taken by the *Rubin* and *Nemours* courts. *See, e.g., Mustang Enters., Inc. v. Plug–In Storage Sys., Inc.,* 874 F.Supp. 881, 885, *supplemented by* 1995 WL 55226 (N.D.Ill.1995); *United States v. Davis,* 780 F.Supp. 21, 23–24 (D.D.C.1991); *Lansing–Delaware Water Dist. v. Oak Lane Park, Inc.,* 248 Kan. 563, 808 P.2d 1369, 1377 (1991).

In *Rubin,* the conflict of interest arose because an attorney for the firm that represented the plaintiff previously had met with the defendant in a prospective client interview. In that interview, the defendant provided the attorney with confidential information substantially related to the litigation. The *Rubin* court, in concluding that screening was appropriate, relied primarily on the fact that the attorney had never represented or attempted to represent the plaintiff as a client. The *Rubin* court's approach, although decided under the Code of Professional Responsibility, is consistent with the letter, although possibly not the spirit, of W.Va.R.Prof.Conduct 1.9 and 1.10 because these rules apply to "clients" and "former clients." The defendant in *Rubin* was neither.

In *Nemours,* an attorney who worked in a minor role as counsel for the plaintiff, went to work for the firm representing the defendants. The district court in *Nemours* conducted a functional analysis separate and apart from Delaware's Rules of Professional Conduct. The facts in *Nemours* are distinguishable from this case because the attorney's role in *Nemours* had been minor (i.e., "the duties which typically characterize the life of a young associate"), he only worked on the case over a four month period, and he had no recollection of any confidential information. *Nemours,* 632 F.Supp. at 420, 429. In this case, by contrast, Mr. Watson's role as primary evaluator of San Con's case appears far more significant. Additionally, the

*Nemours* court implied that the plaintiff's motive in raising this issue five months after the attorney's move was harassment. *Id.* at 431. The Court does not question San Con's motives in this case. Despite being able to distinguish *Nemours* and *Rubin,* the Court, as explained below, must note its discomfort with those courts' decisions to sacrifice ethical standards for the sake of expediency.

**4.**

The Court recognizes that there is a trend to liberalize the rules governing imputed disqualification of law firms when a lawyer associated with that firm would be prohibited from representing the client. W.Va.R.Prof.Conduct 1.11 (former government attorneys) and 1.12 (former judges, arbitrators, and law clerks) illustrate well this trend, as does Tentative Draft No. 4 of the proposed *Restatement of the Law Governing Lawyers.* Section 204 of the proposed *Restatement* provides in relevant part:

> The restrictions upon an affiliated lawyer ... do not restrict that lawyer when: ...
>
> (2) The restriction is of representation adverse to a former client ... and there is no reasonable prospect that confidential information of the former client will be used with material adverse effect on the former client because:
>
> (a) The confidential client information communicated to the personally-prohibited lawyer is not likely to be significant in the later case;
>
> (b) Adequate screening measures are in effect to eliminate involvement by the personally-prohibited lawyer in the representation; and
>
> (c) Timely and adequate notice of the screening has been provided to all affected clients....

Based on the language in the proposed *Restatement,* the district courts in *Rubin, supra,* and *Nemours, supra,* easily could have reached the conclusions that they did. In this case, however, even the proposed *Restatement* rule would not permit Mr. Ruley to continue to represent the plaintiffs because Mr. Watson and Steptoe & Johnson, in attempting to create a Chinese wall around Mr. Watson, apparently believe that Mr.

Watson has confidential information bearing on the central issues in this case.[5]

Even so, the Court is troubled by the trend to dispose of centuries-old confidentiality rules solely for the convenience of modern lawyers who "move from one association to another several times in their careers." W.Va.R.Prof.Conduct 1.10 cmt. Lawyers and law firms are more than mere business entities. According to the preamble of the W.Va.R.Prof.Conduct, "[a] lawyer is a representative of clients, an officer of the legal system and a public citizen having special responsibility for the quality of justice." In an age of sagging public confidence in our legal system, maintaining confidence in that system and in the legal profession is of the utmost importance. In this regard, courts should be reluctant to sacrifice the interests of clients and former clients for the perceived business interest of lawyers, especially when the state supreme court, in promulgating the Rules of Professional Conduct, has failed to adopt contrary rules. While these considerations may dampen law firm mergers, such is the price that lawyers must pay for their special status in our society.

In a recent article, Professor Forest J. Bowman, a noted authority in the field of legal ethics and the plaintiffs' expert, wrote: "Law firm mergers present potential conflicts of interest problems that require attention early in the process of negotiating the merger." Forest J. Bowman, *Conflicts of Interest in Law Firm Mergers*, Bowman's Ethics & Malpractice Alert, Oct. 1992, at 1. In that article, Professor Bowman discussed the decision of the Third Circuit in *In re Eastern Sugar Antitrust Litigation*, 697 F.2d 524 (3d Cir.1982), requiring pre-merger notification of conflicts of interest to the court where the litigation is taking place. Although this Court believes that such a prophylactic rule is unnecessary in the typical case, the court agrees with Professor Bowman that *Eastern Sugar* "should be required reading for members of every law firm contemplating merger" and that the parties to a potential merger should address and resolve potential conflicts of interest before they merge, rather than afterward. Bowman, *supra*, at 1.

Unfortunately, Steptoe & Johnson and Ruley & Everett failed to heed this advice. The firms clearly recognized the obvious conflict of interest involved in this case—Steptoe and Johnson when it originally declined to represent the plaintiffs and Mr. Ruley when he wrote to San Con and Mt. Hawley asking for their consent to his continued representation of the plaintiffs. The problem in this case is that the firms apparently did not discover the conflict of interest involved until shortly before their official merger date. As a result, they were left in an awkward position when San Con refused the consent to Mr. Ruley's continued representation of the plaintiffs. Lawyers and law firms must consider and address the effects of mergers and new associations on their clients well in advance of when such events occur.

**D.**

The Court notes the concerns of Mr. Ruley and Steptoe & Johnson that their professional integrity and ability to guard client confidences are being called into question by the disqualification motion. Addressing similar concerns, the district court in *Rogers v. Pittston*, 800 F.Supp. 350, 354–55 (W.D.Va.1992), *aff'd*, 996 F.2d 1212 (4th Cir.1993), stated:

This Court has no doubt that Johnson [the challenged attorney] testified truthfully to his lack of knowledge to any confidences. Furthermore, this Court is convinced that Johnson has made every effort to ensure that he was acting in an ethical manner. However, it is not for the court to consider "whether the motives of counsel in seeking to appear despite his conflict are pure or corrupt; in either case the disqualification is plain."

This Court certainly does not question the integrity of Mr. Ruley and the other Steptoe & Johnson attorneys involved in this case nor their assurances that San Con's confidences will remain confidential. This Court also understands the sensitivity of lawyers who perceive that opposing counsel is questioning

---

**5.** The Court has not conducted an in camera review of the information that San Con provided to Mr. Watson.

**364**

their personal integrity and ability to guard client confidences.

Nevertheless, lawyers must avoid responding to such motions with personal attacks. In their response to San Con's motion to disqualify Mr. Ruley and Steptoe & Johnson, the plaintiffs wrote:

> It appears that what San Con really intends to communicate darkly ... is insinuation and innuendo to the effect that Steptoe & Johnson in general and Bob Steptoe, Jim Watson and Dan Ruley in particular lack sufficient integrity to not breach the confidences communicated between San Con and Watson and to suggest otherwise is naive. *It is fair to add that the experience of the undersigned has been that people who throw such insinuation or innuendo at others sometimes have personal familiarity with it.*

(Emphasis added.)

West Virginia's Code of Professional Courtesy states: "While my duty is to zealously represent my client, I will treat opposing counsel with courtesy and respect. I will refrain from unnecessary or unjustified criticism of the Court, my adversary or my adversary's client." The comment to W.Va.R.Prof.Conduct 3.5 provides that "[r]efraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak on behalf of litigants." The Court believes that the above statement crossed the line between zealous representation and unnecessary ad hominem personal attack and thus has no place in a litigant's brief. The Court will not countenance such attacks.

### III. Conclusion

For the foregoing reasons, the Court **GRANTS** San Con's motion to disqualify Daniel A. Ruley, Jr. and Steptoe & Johnson from continued representation of the plaintiffs in this action. The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record.